IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACKIE FLESNER, | ) | 4:06CV3010 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, the plaintiff, Jackie Flesner, contends that an administrative law judge erred by failing to give proper weight to the opinion of her treating physician, by not fully crediting her own testimony, and by relying upon a vocational expert's opinion that a person in Flesner's position could work as a telephone solicitor or a cashier. I will reverse the ALJ's determination that Flesner is not disabled and will remand the case for further proceedings.

## *I. BACKGROUND*

Flesner applied for disability insurance benefits and supplemental security income on June 6, 2003, when she was 44 years old, alleging that she became disabled on June 1, 2003, due to back pain. She was found "not disabled" on November 24, 2003, and that finding was reaffirmed on January 16, 2004, after reconsideration.

At Flesner's request, an administrative hearing was held on March 2, 2005. Testimony was provided by Flesner, who was represented by counsel, and by a vocational expert under contract with the agency. The ALJ's adverse decision was issued on May 23, 2005.

On November 14, 2005, the Appeals Council denied Flesner's request for further review. This action was timely filed on January 17, 2006.

### A. Findings by the ALJ

The ALJ evaluated Flesner's claims according to the five-step sequential analysis prescribed by the social security regulations. See 20 C.F.R. §§ 404.1520 and 416.920. Among other things, he found (1) that Flesner had not engaged in any substantial gainful activity since June 1, 2003; (2) that Flesner has medically determinable impairments consisting of discogenic and degenerative disorders of the back, obesity, and chronic obstructive pulmonary disease; (3) that while these impairments are "severe" under the regulations, they do not meet or equal those listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) that Flesner lacks the residual functional capacity to return to her past relevant work as a hand packager, nurse assistant, or production worker; and (5) that Flesner retains the capacity to perform certain sedentary occupations which exist in significant numbers in the regional economy, and thus is not under a disability.

### B. Issues on Appeal

Flesner requests that the Commissioner's decision be reversed and the case remanded for payment of benefits because:

1. The ALJ failed to accept as controlling the limitations placed on Flesner by her treating physician, Douglas M. Laflan, M.D., pursuant to Social Security Ruling (SSR) 96-2p, or to otherwise give proper weight to Dr. Laflan's opinions pursuant to 20 C.F.R. §§ 404.1527(d) and 416.927(d).

2. The ALJ failed to assess the credibility of Flesner's testimony in accordance with Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1994).

3. The ALJ erred in accepting a vocational expert's testimony which identified jobs that contradicted the Dictionary of Occupational Titles (DOT) skill level demands.

## *II. DISCUSSION*

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. Id., at 960-61; Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

### *A. Treating Physician's Opinion*

Flesner, citing SSR 96-2p,[1] first claims that the ALJ was required to give

---

[1] This Social Security Ruling emphasizes that:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the

3

controlling or substantial weight to Dr. Laflan's opinions as set forth in a "spinal physical capacities evaluation" form that was completed at the request of Flesner's attorney on April 5, 2004. (Tr. 309-314.) This form shows that Dr. Laflan, a family physician, had been treating Flesner for 17 years; that Flesner was diagnosed with spondylolisthesis of L5 on S1 and degenerative disc disease at L5-S1, as shown by x-rays and an MRI of the lumbar spine; that her symptoms included severe daily low back pain and radiation to the right leg; and that objective signs included positive straight leg raising bilaterally at 60°, muscle spasm, and impaired sleep. Dr. Laflan indicated by means of check marks on the form that Flesner was not a malingerer and that emotional factors did not contribute to the severity of her symptoms; that her pain constantly interfered with attention and concentration; that her prognosis was poor; and that her impairments had lasted or could be expected to last at least 12 months. Dr. Laflan estimated that Flesner could only walk ½ block without rest or severe pain,

---

nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-2p, 1996 WL 374188 at *1 (S.S.A., July 2, 1996).

4

sit for 10 minutes at a time, stand for 5 minutes at a time, and sit or stand for less than 2 hours during an 8-hour workday.  He also indicated that Flesner needed a job that would permit her to sit or stand at will, to lie down every 2 to 3 hours, and to elevate her feet above her hips 3 or 4 times a day; that she could do no lifting or reaching, and no bending or twisting at the waist; that she was only able to work less than 2 hours per day, and not more than 3 days per week; and that she was likely to be absent from work more than 3 times a month because of her impairments.[2]

The ALJ dismissed Dr. Laflan's opinions,[3] stating that "this medical report provides no value in determining the claimant's disability" because "both Dr. Laflan and Ms. Flesner have acknowledged that the doctor simply asked the claimant the questions and wrote down her responses."  (Tr. 21.)  Dr. Laflan's records show that Flesner came in for an office visit on April 5, 2004, and that the form was completed during the course of the visit.  The entry for that date states, in part:

> We also reviewed the form we got from her attorney about her disability claim and we had her answer the questions and we reviewed her surgical consultations.  It appears that her biggest problem is this grade II spondylolisthesis of L5 on S1.  It's probably not going to get any better

---

[2] Physicians regularly opine as to the number of hours that a claimant can work, and, in fact, such medical opinions are encouraged in social security cases.  See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir.1995).  A vocational expert must then take into account medical limitations, including opinions on work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment.  See id.

[3] The ALJ determined that Flesner "can lift and carry objects weighing 10 pounds occasionally, 5 pounds frequently; sit (with normal breaks and meal period and opportunities to stretch as needed) about 6 hours within an 8-hour workday; stand and/or walk (with normal breaks and meal period and opportunities to stretch as needed) about 2 hours within an 8-hour workday; and occasionally perform postural tasks involving bending, kneeling, stooping."  (Tr. 21, 23-24.)

without surgical intervention but the neurosurgeon didn't want to attempt that until she lost a significant amount of [weight].

(Tr. 315.)  The ALJ questioned Flesner about this entry at the hearing:

> Q.    . . . So did he just ask you the questions and then wrote down what you said?
> A.    Yeah.  Yes, he did.
> Q.    Okay.  So that wasn't based on any independent examination that he made.  That was just based on what you had told him.
> A.    Right.

(Tr. 362.)

A treating physician's opinion is generally entitled to substantial weight, see Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998), and must be accorded controlling weight under the regulations if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  Those regulations also require "that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s)."  SSR 96-2p, 1996 WL 374188 at *5.  See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) ("Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting."); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("[W]hether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation."); Prosch, 201 F.3d at 1013 (same).

In this case, the ALJ essentially found that Dr. Laflan did not provide his own opinions, but instead acted as Flesner's scribe, in completing the "spinal physical

capacities evaluation" form. This fact finding is supported by substantial evidence, and it constitutes a "good reason" for rejecting the document.[4]

That being said, however, the result of the ALJ's finding is an incomplete record that contains no assessment of Flesner's impairments by either a treating physician or an examining physician.[5] The Court of Appeals has instructed that the ALJ has a duty to develop the record further in this circumstance:

> The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [claimant's] RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir.1999). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. Id. In our opinion, the ALJ should have sought such an opinion from [claimant's] treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess [claimant's] mental and physical residual functional capacity. As this Court said in Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir.

---

[4] A treating physician's use of a checklist to render medical opinions in social security cases is generally acceptable, however. See Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (The Court of Appeals has "never upheld a decision to discount [a medical source statement] on the basis that the 'evaluation by box category' is deficient ipso facto.").

[5] Although not mentioned in the ALJ's decision, a physical RFC assessment was completed by a state agency medical consultant, Glen D. Knosp, M.D., on November 3, 2003, and reaffirmed as written by another state agency medical consultant, Tom Chael, M.D., on January 14, 2004, based solely upon their review of then-existing records. (Tr. 295-308.) The opinions of these non-examining consulting physicians, standing alone, do not constitute "substantial evidence." See Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004).

7

> 1975): "An administrative law judge may not draw upon his own inferences from medical reports. See Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir.1974); Willem v. Richardson, 490 F.2d 1247, 1248-49 n. 3 (8th Cir.1974)."

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (record contained numerous treatment notes, but none of claimant's doctors was asked to comment on his ability to function in the workplace). See also Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004) (ALJ's duty to develop the record fully and fairly includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue); Bowman v. Barnhart, 310 F.3d 1080, 1084-85 (8th Cir. 2002) (ALJ was obligated to contact physician who had treated claimant for 30 years for additional evidence or clarification of doctor's medical notes, and for an assessment of how impairments limited claimant's ability to engage in work-related activities). But cf. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (Nevland inapposite where claimant failed at step four to prove that she was unable to perform past relevant work).

The medical record in the present case shows that Flesner first complained to Dr. Laflan about lower back pain on May 19, 2003.[6] On examination, he found that

---

[6] Dr. Laflan's records date back to August 1998. They show that Flesner complained of pain in her upper back in July 1998, after she injured herself while lifting a patient at the nursing home where she was working. (Tr. 205.) Dr. Laflan noted that an MRI was taken 16 months earlier for a similar complaint. He ordered a CT scan of Flesner's thoracic spine, which showed "no herniated discs," but "some thoracic spondylosis, slightly worse than a little over a year ago." (Tr. 205.) He thought "she probably has a disc bulge from time to time, especially when lifting," and recommended that she "find a different type of employment where she's not having to lift heavy objects." (Tr. 205.) Between October 1998 and April 1999, Flesner was seen several times by Bryan D. Bedthauer, M.D., who treated her for pain in the upper back and shoulders. (Tr. 211-216.) Flesner injured her lower back in June 1999, again while lifting a patient, and Dr. Laflan again advised that she seek

8

Flesner was "a little tender with palpation in the lumbar area." Dr. Laflan prescribed Norgesic Forte, a combination of aspirin and orphenadrine (a muscle relaxant), and noted that "if things aren't improving [in 2 weeks], we should investigate a little more with an MRI." (Tr. 256.) Flesner reported back a week later that the medication was not working, but that she had gotten some relief with 800 milligrams of ibuprofen, which Dr. Laflan then prescribed. The next entry is August 11, 2003, and it indicates that Flesner has "been feeling good." (Tr. 256.) Flesner had an annual physical exam on August 21, 2003, during which Dr. Laflan noted that Flesner "states she's been having epidurals at Plainview [Hospital] for back pain for slipped disc[7] . . . [and] she states that they told her that her pelvis is pushing away from her vertebra." (Tr. 256.) Flesner returned to Dr. Laflan's office on September 16, 2003, complaining of a headache that she been experiencing since having a third epidural steroid injection. Dr. Laflan prescribed Bancap HC, a combination of hydrocodone (a narcotic) and acetaminophen. (Tr. 256-257.) When Flesner's headache continued, Dr. Laflan ordered a head CT scan and MRI that revealed a cyst in the right temporal region. On

---

other employment. (Tr. 204.) Flesner received chiropractic treatments for about three weeks. (Tr. 223-232.) Flesner continued to see Dr. Laflan on a frequent basis, but there were no more complaints of back pain until May 19, 2003.

[7] The record reflects that Flesner was seen at the hospital on May 31, 2003, where a lumbar spine x-ray and MRI were obtained. (Tr. 265-270.) The attending physician, John McPhee, M.D., prescribed physical therapy, but Flesner failed to appear for her appointment on June 6, 2003. (Tr. 281.) Dr. McPhee also referred Flesner to Steven Stokebary, M.D., who examined Flesner on July 15, 2003. Dr. Stokebary noted that Flesner had "some mild diffuse tenderness around the lumbosacral area" on palpation, but range of motion tests were normal and provocative tests, including straight leg raising, were negative. (Tr. 279.) He concluded: "She is having quite a bit of pain right now. If we can get her pain to settle down, then she may be able to stabilize her back with exercises, physical therapy, etc., and a brace to minimize her symptoms. If this is satisfactory, then she may be a candidate for lumbar fusion." (Tr. 280.) The hospital's pain clinic then administered epidural steroid injections to Flesner on July 24, August 12, and September 9, 2006. (Tr. 275-278.)

October 9, 2003, he referred Flesner to a neurosurgeon, George M. Greene, M.D. (Tr. 257.)

Dr. Greene examined Flesner on November 3, 2003, and wrote to Dr. Laflan that same date. He concluded that the cyst required no treatment, but suggested that Flesner should have physical therapy for "a recent lumbar strain." (Tr. 291.) Flesner had told Dr. Greene that her headaches and low back pain had been improving, but that she "had severe exacerbation of her low back pain" on October 31, 2003, while carrying garbage out to the curb. Dr. Greene noted: "There is left lumbosacral tenderness to palpation and percussion. Her lumbosacral range of motion is markedly limited throughout secondary to low back pain. Straight leg raising is negative on the right. On the left at 45 degrees she experiences low back pain." (Tr. 290.) After examining a lumbar x-ray and MRI that had been performed at Plainview Hospital on May 31, 2003, Dr. Greene recommended that flexion and extension lumbar spine films be obtained and "if there is evidence of instability or her low back pain persists despite a trial of physical therapy, . . . that she be evaluated for the possibility of a lumbar spine fusion procedure." (Tr. 289.)

When Dr. Laflan next saw Flesner on November 5, 2003, he prescribed a narcotic, OxyContin, for her back pain. Flesner reported that Dr. Greene had "told her to continue taking analgesics, epidurals and PT or whatever it takes to keep her comfortable but someday she may need surgical intervention." (Tr. 293.) At her next visit on November 14, 2003, Flesner did not complain of lower back pain, but, rather, of "aches all over, especially her joints," which Dr. Laflan attributed to a continuing problem with gout. (Tr. 292.)

Flesner telephoned Dr. Laflan on November 26, 2003, "wanting to know what to do about her back," and complaining that she could "hardly do anything physical but what it causes her a lot of pain." (Tr. 292.) During an office visit a week later, on December 3, 2003, Flesner stated that she "gets along reasonably well with the

10

Oxycontin, especially at night which is about the only time she takes it," but that she wanted to be evaluated for a possible spinal fusion. (Tr. 292.) Dr. Laflan referred Flesner to the Nebraska Spine Center, where she was seen on December 12, 2003, by H. Randal Woodward, M.D. (Tr. 292, 182.) Flesner called Dr. Laflan for a refill of the OxyContin prescription on December 23, 2003, stating that "[t]he back surgeon she saw thinks she's going to need an operation but wants her to lose weight until she's under 200 lbs. again before he'll operate on her." (Tr. 292.)

Dr. Woodward's notes, which were not transcribed until December 22, 2003, do not mention surgery. He observed that Flesner appeared comfortable, her gait was normal, and she changed positions without any obvious discomfort. (Tr. 182.) She could touch her fingertips to her ankles without pain. Flesner had mild to moderate discomfort in the lumbosacral region on palpation, but straight leg raising was negative. (Tr. 182-183) Dr. Woodward's only comments and recommendations were as follows:

> I have discussed the situation with the patient in moderate detail and feel that her symptoms are probably coming from the L5-S1 level as outlined by Dr. Greene. She has had several epidural steroid injections that were possibly not affected because of the technique used. It might be worthwhile trying this once again, but I need to review the radiographic findings of the lumbar spine. I have asked her to obtain the MR scan and any other x-ray evaluation of her lumbar spine that she may have available. Unfortunately, we only received the scans of her brain today. She is significantly overweight as well, and I have asked her to concentrate on weight loss as much as possible. Using nonsteroidal anti-inflammatory medications does not seem to be a good option in view of her solitary kidney.[8] I will contact the patient once I have the scans available for review.

(Tr. 183-184.) No subsequent entries from Dr. Woodward are contained in the

---

[8] Flesner donated a kidney to her son in 2001.

11

administrative record.

Flesner returned to Dr. Laflan's office on January 22, 2004, complaining of her inability to lose weight and exhibiting signs of depression. She also reported "after any length of time to be on her feet that her back hurts significantly." (Tr. 316.) Dr. Laflan prescribed Prozac and "[s]trongly recommend[ed] she try and seek a second opinion on her back problem and get something done with this" since "[s]he reports that her present physician will not do anything with her back until she loses a significant amount [of] weight." (Tr. 316.)

At a follow-up exam on February 23, 2004, Flesner told Dr. Laflan that "her back pain continues to give her quite a lot of problems, especially at night." (Tr. 315.) Flesner also stated that "she's tried taking 2 [OxyContin pills] at a time and that seems to work reasonably well," so Dr. Laflan doubled her dosage. (Tr. 315.) At her next office visit on March 18, 2004, Flesner reported that she had twisted her ankle while out walking the previous day and had fallen down; her back pain was not discussed. (Tr. 315.) On April 5, 2004, when the "spinal physical capacities evaluation" form was completed, Flesner reported that she had stopped taking Prozac and complained that she was "feeling tired all the time" and "can hardly stay awake to do anything." (Tr. 315.)

After testing Flesner's thyroid, Dr. Laflan instructed her to get back on Prozac. (Tr. 320.) On June 24, 2004, on a follow-up visit for her back Flesner complained of back pain and peripheral edema. Dr. Laflan noted that Flesner had swelling in her legs before, and that she "does sit a lot because of her back pain" and "doesn't do much physical activity." He prescribed a diuretic and counseled Flesner to decrease her salt consumption. (Tr. 319.) On July 2, 2004, Flesner complained of dizziness; Dr. Laflan prescribed an antibiotic. No mention was made of back pain. (Tr. 319.) On September 10, 2004, Flesner complained of allergies. Again, no mention was made of back pain. (Tr. 319.) On December 15, 2004, Flesner complained of pain

12

in her legs. (Tr. 319.) This was the last entry for Dr. Laflan that is contained in the administrative record.

While the Commissioner argues that the ALJ could rightfully dismiss the restrictions noted in the "spinal physical capacities evaluation" form because they were not supported by Dr. Laflan's treatment notes[9] and were inconsistent with the medical record as a whole,[10] the ALJ made no such effort. As stated above, the ALJ simply reasoned that the form recorded Flesner's personal beliefs, and not any medical opinions held by Dr. Laflan. Because the Commissioner's argument is inconsistent with the ALJ's stated reasoning, I must reject it and remand the case for development of the record to include an assessment by Dr. Laflan, and by any other treating or examining physicians that the Commissioner may deem appropriate, regarding Flesner's ability to function in the workplace.

---

[9] For example, the Eighth Circuit has upheld an ALJ's decision to discount a treating physician's "medical source statement" (MSS) where the severe limitations listed on the form "stand alone," and were "never mentioned in [the physician's] numerous records of treatment" nor supported by "any objective testing or reasoning which would indicate why the claimant's functioning need be so restricted." See Hogan, 239 F.3d at 961. See also Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) (ALJ properly discounted treating physician's opinion that claimant, who admittedly had chronic hip and back pain, could only stand for 2 hours and sit for 4 hours, and do neither for more than 1 hour at a time, where medical records did not show that the doctor ever ordered or even suggested to claimant that he limit the time that he stood or sat); Strongson, 361 F.3d at 1071 (affirming the ALJ's decision to give little weight to MSS where the completing physician's opinion was "without explanation or support from clinical findings" and "not internally consistent with [his] own treatment notations").

[10] An ALJ should ordinarily give substantial weight to a treating physician's opinion, but if the opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

13

### *B. Claimant's Credibility*

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing Polaski). The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole. Id. at 972. Where adequately explained and supported, credibility findings are for the ALJ to make. Id. (citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir.2000)).

The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledges and examines those considerations before discounting the subjective complaints. Id. (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir.1996)). Even so, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id. at 738-39.

Although the ALJ's decision in this case cites Polaski and quotes from Social Security Ruling 96-7p[11] and 20 C.F.R. §§ 404.1529 and 416.929, the ALJ does not

---

[11] Among other things, this ruling states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A., July 2, 1996).

appear to have performed the required analysis. The ALJ merely stated that Flesner was not credible because (1) "[o]bjective findings have failed to substantiate the intensity and persistence of her symptoms[,]" (2) "she was observed to sit for 45-60 minutes at the hearing without changing positions, and then only got up to use the restroom[,]" and (3) despite admonishment to participate in physical therapy, she has failed to comply with medical recommendations (Exhibit 13F/110)." (Tr. 21.)

The ALJ does not appear to have considered Flesner's work record or history of work-related back injuries. He did not identify any daily activities that are inconsistent with Flesner's subjective complaints. Similarly, he did not find that Flesner's complaints were inconsistent with her prescribed medications, including two narcotic analgesics, OxyContin and BanCap, that Flesner testified made her tired.[12] The fact that Flesner did not "sit and squirm" at the hearing is of little significance, see Cline v. Sullivan, 939 F.2d 560, 567-68 (8th Cir. 1991), but the ALJ's decision does not indicate the amount of weight that was given to this factor. The ALJ also may have given inordinate weight to Flesner's failure to follow up on Dr. Greene's one-time recommendation that she enroll in physical therapy.

"When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson, 363 F.3d at 738-39. Because I am unable to make either of these affirmative findings in this case, reversal is required. See Callison v. Callahan, 985 F. Supp. 1182, 1187 (D.Neb. 1997) (unless an ALJ explains his views on credibility,

---

[12] The Eighth Circuit has noted that Oxycontin is a "controlled substance with abuse liability similar to morphine," and when used in combination with an anti-depressant can result in sedation. See Bowman, 310 F.3d at 1084 (quoting Physicians' Desk Reference 2912 (5th ed.2002)).

in relation to each Polaski factor, with sufficient detail that a reviewing court can understand the logic of the ultimate credibility conclusion, there is nothing to review).

### C. *Vocational Expert's Opinion*

After testifying that a person with Flesner's RFC (limited to sedentary work with a sit/stand option) would not be able to perform Flesner's past relevant work, the vocational expert testified that the person would be able to work as a phone solicitor. The VE stated that "a younger worker with a high school education (such as Flesner) should be able to do direct entry in the phone solicitor situation," and that there were 25,458 of these jobs in the Nebraska/Iowa/Missouri/Kansas area. (Tr. 374.) The VE also testified that in Nebraska there were 3,928 cashier jobs that involve sedentary work (5 out of 18 cashier job titles under Census Code 472). (Id.) The ALJ relied on the VE's testimony to find that Flesner possesses the residual functional capacity for work that exists in significant numbers in the regional economy.

On examination by Flesner's counsel, the VE acknowledged that the phone solicitor job has a specific vocational preparation (SVP) level of 3 (semi-skilled),[13] and confirmed that he was "not testifying that she could do that work based on transferable skills from the past work . . .." (Tr. 375.) The VE also stated that most of the sedentary cashier jobs were SVP 2 (unskilled) positions, but admitted that some might be classified as SVP 3. (Tr. 376). On follow-up questioning by the ALJ, the VE testified that although the phone solicitor job is rated SVP 3, "[i]n practice we see some high school kids doing telephone soliciting on a part-time basis . . . [and] some people without a high school education doing phone soliciting." (Tr. 377.) He also agreed with the ALJ that the SVP 3 level "would not normally bother anybody with

---

[13] An SVP 3 position typically requires more than 1 month, and up to 3 months, of specific vocational training. See Appendix C to the United States Department of Labor's Dictionary of Occupational Titles (DOT) (4th ed.1991).

a high school education" because SVP 3 is "entry level, . . . the lowest level of semi-skilled." (Tr. 377.)

Flesner's attorney represents that there actually are 19 cashier occupations listed under Census Code 472, and that while five of these are performed at the sedentary exertional level, four are classified SVP 3 and one is classified SVP 6.[14] According to Flesner's attorney, in other words, the VE's testimony that most of the 3,928 sedentary cashier jobs are SVP 2 was wrong—in truth, all of the sedentary cashier jobs are SVP 3 or higher. The Commissioner does not dispute this contention, nor does she argue that the ALJ could rely upon the VE's apparently erroneous testimony regarding the cashier jobs.[15] I therefore deem this point to be conceded.

---

[14] As authority, Flesner's attorney cites the Specific Occupation Selector (SOS) Manual, 4th Edition (U.S. Publishing).

[15] Some courts have held that any discrepancy between a VE's testimony and the DOT must be identified at the hearing or it is too late. See Donahue v. Barnhart, 279 F.3d 441, 446-47 (7th Cir. 2002) ("On the record as it stands—that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning—the ALJ was entitled to reach the conclusion she did."); Martin v. Commissioner of Social Security, 170 Fed. Appx. 369, 373-74, 2006 WL 509393, *4-5 (6th Cir. 2006) (unpublished) (ALJ does not have affirmative duty to conduct independent investigation into the testimony of vocational experts to determine if they are correct). Other courts hold that "when the Commissioner purports to rely on the information in the DOT, the Commissioner must get it right." See Williams v. Commissioner of Social Security, 2006 WL 290561, *2-3 (W.D.Va. Feb. 6, 2006) (ALJ could not rely on VE's testimony that was based on erroneous SVP levels). The Eighth Circuit has not directly addressed this issue, but I am reasonably confident that it would require the Commissioner to demonstrate on appeal that the VE's testimony was reliable even if it was not challenged at the hearing before the ALJ. See, e.g., Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003) ("[A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications, . . . ."); Porch v. Chater, 115 F.3d 567, 572 (8th Cir. 1997) (When expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls.").

On the other hand, the Commissioner does argue that the ALJ was entitled to rely upon the VE's testimony regarding the phone solicitor position, even though its DOT classification was SVP 3 and the VE indicated that Flesner had no transferable skills from her past relevant work.[16]  In support of this argument, the Commissioner relies upon a 2000 policy interpretation ruling that provides, in part:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p, 2000 WL 1898704, *2 (S.S.A. Dec. 4, 2000).

Thus, the Commissioner argues, the ALJ made the required inquiry regarding the inconsistency between the VE's testimony and the DOT classification for the phone solicitor position, and, in response, the VE provided a reasonable explanation that resolved the conflict.  This is nonsense.  Essentially, the VE testified that the

---

[16] "Ability to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work."  SSR 83-10, 1983 WL 31251, *3 (S.S.A. 1983).

phone solicitor occupation is over-classified in the DOT at the SVP 3 level because it can be performed by persons without high school educations. Not only does this explanation confuse job training requirements with educational requirements, but it effectively demotes the occupation of phone solicitor from semi-skilled to unskilled employment.[17] Social Security Ruling 00-4p expressly states that "[a]lthough there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling." Id. at *3. Stated somewhat differently, this case does not involve "an evidentiary conflict between the VE and the DOT," but, rather, "a legal conflict between the VE and the SSA over the definition of a regulatory term, and the VE's testimony cannot prevail." Steward v. Barnhart, 44 Fed. Appx. 151, 152-53, 2002 WL 1791513, *1 (9th Cir. Aug. 5, 2002) (unpublished) (VE's testimony that claimant could perform certain occupations because they were entry-level and required no transferable skills was inconsistent with the regulatory definitions of "SVP 3" and "semi-skilled").

### III. CONCLUSION

For the reasons stated, I find that the Commissioner's decision is not supported by substantial evidence on the record as a whole and is contrary to law.

Accordingly,

---

[17] "A skill is knowledge of a work activity that requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation that is above the unskilled level (requires more than 30 days to learn). (See SSR 82-41.) Skills are acquired in PRW [past relevant work] and may also be learned in recent education that provides for direct entry into skilled work." SSR 00-4p, 2000 WL 1898704 at *3. "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." Id.

IT IS ORDERED that the decision of the Commissioner is reversed, and the cause is remanded for development of the record regarding Flesner's ability to function in the workplace, for reconsideration of Flesner's credibility, and for a proper step-5 determination of whether Flesner's impairments prevent her from working. Judgment will be entered by separate document.

August 31, 2006.                    BY THE COURT:

                                    s/ *Richard G. Kopf*
                                    United States District Judge